In the Matter of GEORGIA STEEL, INC., Debtor.

GEORGIA STEEL, INC., Plaintiff,

and

The Creditors' Committee, Intervenor-Plaintiff,

v.

The CITIZENS AND SOUTHERN NATIONAL BANK, Credit Alliance Corporation and Leasing Service Corporation, Defendants.

Bankruptcy No. 81–50966.
Adv. No. 82–5045.

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

Sept. 17, 1982.

immediate claim to the fund by a creditor not a    party to this adversary proceeding.

Jerome L. Kaplan and Ward Stone, Jr., Kaplan & Thomason, P.A., Macon, Ga., for debtor.

Claude J. Hicks, Jr., Macon, Ga., for Creditors' Committee.

Ed S. Sell, III, Sell & Melton, Macon, Ga., for Citizens & Southern National Bank.

## MEMORANDUM OPINION ON COMPLAINT SEEKING A DECLARATORY JUDGMENT

ROBERT F. HERSHNER, Jr., Bankruptcy Judge.

## STATEMENT OF THE CASE

On September 3, 1981, Plaintiff Georgia Steel, Inc. (Georgia Steel) filed with this Court its petition under Chapter 11 of Title 11 of the United States Code. On February 18, 1982, Georgia Steel filed with the Court a "Complaint Seeking a Declaratory Judgment." The complaint requests that the Court render a declaratory judgment as to whether various orders issued during the course of Georgia Steel's bankruptcy case require Georgia Steel to execute certain Georgia Motor Vehicle Certificate of Title application forms so as to show the three defendant creditors—The Citizens and Southern National Bank (C & S), Credit Alliance Corporation (Credit Alliance), and Leasing Service Corporation (Leasing Service)—as lienholders on the vehicles described in the certificates of title.[1]

After reviewing the evidence and the arguments of counsel, the Court is of the opinion that Georgia Steel should not be required to execute the motor vehicle certificate of title application forms.

## FINDINGS OF FACT

After Georgia Steel filed its bankruptcy petition under Chapter 11, the reorganization chapter of the Bankruptcy Code, there was an immediate crisis over the issue of Georgia Steel's use of cash collateral.[2] The four orders now before the Court were entered as interim orders in this "cash collateral crisis." The four orders are as follows:

1. *The September 14, 1981 "Interim Order on Debtor's Application to Use Cash Collateral."* The debtor in possession applied to the Court for leave to use cash collateral, and a preliminary hearing on the matter was held on September 11, 1981. On September 14, 1981, the Court entered a consent order continuing the preliminary hearing to September 18, 1981 and allowing Georgia Steel to use cash collateral to meet payroll obligations, general overhead expenses and miscellaneous operating expenses. The order was to remain in effect until further order of the Court, and during the effective period of the order, the parties advised the Court that they would be attempting to reach an agreement regarding the use of cash collateral.

2. *The September 25, 1981 "Consent Interim Order of Debtor-in-Possession's Application to Use Cash Collateral."* On September 25, 1981, three weeks after Georgia Steel filed its bankruptcy petition, the parties entered into a "Consent Interim Order of Debtor-in-Possession's Application to Use Cash Collateral." (Consent Interim Order), which authorized Georgia Steel to use cash collateral subject to certain conditions. The fourth condition of the consent order was:

> The debtor-in-possession is to cause the security interests held by the Citizens & Southern National Bank, Credit Alli-

1. Although the orders at issue address themselves to Georgia Steel and all three defendant creditors in this adversary proceeding, only C & S is actively participating in this declaratory judgment action. Both Credit Alliance and Leasing Service Corporation have been paid their secured debts in full.

2. "Cash collateral" is defined at 11 U.S.C.A. § 363(a) as "cash, negotiable instruments, doc-

uments of title, securities, deposit accounts, or other cash equivalents in which the estate and an entity other than the estate have an interest." *Id.* Subsection (c)(2) of section 363 forbids the use, sale, or lease of cash collateral unless each entity having an interest in the cash collateral consents or the court, after notice and a hearing, authorizes the use, sale, or lease of the cash collateral.

ance Corporation and Leasing Service Corporation, in accordance with their present priority status to be perfected in any unencumbered motor vehicles owned by the debtor-in-possession regarding which such security interests are not properly noted on any Georgia Motor Vehicle Certificates of Title covering such motor vehicles.

3. *The October 9, 1981 "Order."* On September 18, 1981, prior to the entry of the September 25, 1981 Consent Interim Order, the three defendant creditors filed a "Joint Application for Post-Petition Security Interests in Receivables, Inventory, Unencumbered Equipment & Vehicles." Notice was sent to Georgia Steel's creditors and to Georgia Steel, stating that any objection to the joint application should be filed with the Court. No objection was filed, and on October 9, 1981, the Court entered an order granting to the three defendant creditors a postpetition security interest "in accordance with their present priority status in the Debtor's receivables, inventory, unencumbered equipment and vehicles acquired or accrued by the Debtor."

4. *The November 11, 1981 "Order on Application for Authorization to Use Cash Collateral."* On November 6, 1981, the three defendant creditors revoked their consent to the September 25, 1981 Consent Interim Order. Thereafter, on November 11, 1981, the Court entered an order granting Georgia Steel's application to use cash collateral and requiring Georgia Steel to pay $25,000 a month to whichever of the three defendant creditors had priority in the cash collateral. The order further required Georgia Steel to give the three defendant creditors a substitute lien on all receivables as they were created, in accordance with the respective priorities of the three defendant creditors.

Of the four orders, the one that is the focus of the Court's inquiry is the September 25, 1981 Consent Interim Order. At the time that order was signed, Georgia Steel was under the impression that there were only a few vehicles upon which C & S had not perfected its security interest. The Court also was led to believe that there were only "a few" vehicles upon which C & S needed to perfect its security interest.

After the Consent Interim Order was signed, C & S delivered to Georgia Steel *sixty* Georgia Motor Vehicle Certificate of Title application forms and requested that Georgia Steel execute all sixty in accordance with the provisions of the Consent Interim Order. Upon receiving C & S's request, Georgia Steel made inquiry of C & S as to the status of C & S's perfection in the sixty vehicles. Georgia Steel was told that forty-nine motor vehicle certificates of title had been delivered to C & S on February 4, 1981 and that three more had been delivered in June of 1981. C & S had taken no action to perfect its security interest in the motor vehicles covered by those fifty-two certificates of title. The remaining eight titles were delivered to C & S by Georgia Steel following the entry of the Consent Interim Order. Those eight certificates of title had been in the possession of Georgia Steel at the time the Consent Interim Order was entered.

C & S's request that Georgia Steel execute all sixty motor vehicle certificate of title application forms gave rise to Georgia Steel's request for declaratory judgment as to its legal duty under the four orders described above.

## CONCLUSIONS OF LAW

The first order issued by the Court, the September 14, 1981 "Interim Order on Debtor's Application to Use Cash Collateral" entered on September 14, 1981, is not at issue in reaching a decision on Plaintiff's complaint for declaratory judgment. The order specifically stated that the debtor in possession, Georgia Steel, was authorized to use cash collateral "until further order of this Court." After that order, three other orders were entered pertaining to Georgia Steel's use of cash collateral. Those orders effectively superseded the September 14, 1981 order, which was only a temporary measure to enable Georgia Steel to continue

its operations, pending negotiations between the parties as to Georgia Steel's use of cash collateral. Therefore, the Court need not consider the September 14, 1981 order in making its decision in this adversary proceeding.

Neither does the Court need to consider the October 9, 1981 order granting the three defendant creditors a postpetition security interest "in the Debtor's receivables, inventory, and unencumbered equipment and vehicles acquired or accrued *by the Debtor*" (emphasis added). There was no Debtor until the Chapter 11 petition was filed,[3] and thus the October 9 order deals only with property acquired by Georgia Steel after September 3, 1981, the date the Chapter 11 petition was filed and Georgia Steel became a "Debtor." There has been no evidence presented to the Court that the Debtor acquired *any* of the sixty motor vehicles after September 3, 1981. Therefore, the October 9, 1981 order does not affect the Court's decision as to whether Georgia Steel must execute the sixty motor vehicle certificate of title application forms, since that order dealt only with vehicles acquired *after* September 3, 1981.[4]

The "Order on Application for Authorization to Use Cash Collateral" entered on November 11, 1981 allowed Georgia Steel to use cash collateral conditioned on: (1) the payment by Georgia Steel of $25,000 a month and (2) Georgia Steel's giving the three defendant creditors a substitute lien on all of its receivables as the receivables were created. Georgia Steel was not ordered to give the three defendant creditors a lien on all unencumbered motor vehicles under the terms of the November 11, 1981 order. Georgia Steel contends that the

three defendant creditors' revocation of their consent to the September 25, 1981 Consent Interim Order, coupled with the November 11 order making no mention of a lien on motor vehicles, supersedes the September 25, 1981 Consent Interim Order and negates any security interest that might have been given to the three defendant creditors by the Consent Interim Order. The Court need not address that argument in reaching its decision.

The focus of the Court's inquiry in this adversary proceeding is the September 25, 1981 Consent Interim Order. That order, signed by the Court and consented to by all parties, provided that:

> The debtor-in-possession is to cause the security interests held by the Citizens & Southern National Bank, Credit Alliance Corporation and Leasing Service Corporation, in accordance with their present priority status to be perfected in any unencumbered motor vehicles owned by the debtor-in-possession regarding which such security interests are not properly noted on any Georgia Motor Vehicle Certificates of Title covering such motor vehicles.

The evidence reveals that at the time the Consent Interim Order was entered into and during negotiations prior to the entry of the Consent Interim Order, C & S was aware of its unperfected status as to the fifty-two vehicles covered by the motor vehicle certificates of title in C & S's possession. During the negotiations, however, time was crucial and Georgia Steel did not inquire into the status of C & S's perfection, nor did C & S volunteer the information to Georgia Steel. Both the Court and Georgia

---

**3.** "Debtor" is a term of art used to designate the "person or municipality concerning which a [bankruptcy] case ... has been commenced." 11 U.S.C.A. § 101(12) (West 1979). Thus, by definition, prior to filing the bankruptcy petition, there can be no debtor.

**4.** Additionally, the Court takes judicial notice that the "Notice of Joint Application for Post-Petition Security Interests in Receivables, Inventory, Unencumbered Equipment and Vehicles," sent on September 21, 1981 by the Clerk of this Court to Georgia Steel and all creditors

of Georgia Steel listed in Georgia Steel's schedules, stated that the security interests were to cover only that property "acquired or accrued" by "the above captioned debtor-in-possession." Thus, Georgia Steel's creditors had notice only that vehicles acquired by Georgia Steel *after* September 3, 1981 would be subject to the postpetition security interest, since the debtor in possession did not exist as such prior to the September 3 filing of Georgia Steel's bankruptcy petition. 11 U.S.C.A. §§ 1101, 101(12) (West 1979).

Steel were led to believe that the number of vehicles in which a security interest remained to be perfected was limited.

Rule 924 of the Rules of Bankruptcy Procedure, R.Bankr.P. 924, makes Rule 60 of the Federal Rules of Civil Procedure, Fed.R. Civ. 60, applicable in bankruptcy cases. Rule 60 of the Federal Rules of Civil Procedure provides in part that:

> (b) ... On Motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided in Title 28, U.S.C., § 1655, or to set aside a judgment for fraud upon the court.

Fed.R.Civ.P. 60(b).

Although no motion under Rule 60(b) has been made by Georgia Steel, Georgia Steel has questioned the effect of the four interim orders in light of C & S's having withheld the information that C & S held certificates of title to fifty-two vehicles in which it had not perfected its security interest. Under Rule 60(b), such a withholding could justify a court's revoking or amending an order. Since Rule 60(b) allows a court to examine the continuing validity of its orders, the Court today follows the body of case law interpreting Rule 60(b) in determining the effect of the four orders.[5]

■ A motion for relief from a judgment under Rule 60(b) is addressed to the discretion of the Court. *Tipton v. Tennesco, Inc. (In re Tipton),* 18 B.R. 464 (Bkrtcy.E.D. Tenn.1982). The leading case on the application of Rule 60 to bankruptcy proceedings is *Otte v. Manufacturers Hanover Commercial Corp. (In re Texlon Corp.),* 596 F.2d 1092 (2d Cir.1979). In *Texlon,* the bankruptcy judge had erroneously granted an ex-parte order of cross-collateralization but considered himself unable to amend the order. The Second Circuit held that Bankruptcy Rule 924, making Federal Rule of Civil Procedure 60 applicable to the bankruptcy case, enabled the bankruptcy judge to amend his order. The Second Circuit stated that the test a court should use in deciding whether to vacate or amend an order is:

> [W]hether, upon granting the motion to reconsider, the court will be able to reestablish the rights of the opposing party as they stood when the original judgment was rendered.... Almost by definition it cannot be necessary for reconsideration that the court should be able to place a losing party in the same position as if there had been none.

596 F.2d at 1101.

The Second Circuit went on the remark that bankruptcy cases are both continuous and long, and because of that unique nature the application of a rule permitting vacation or modification of an order has much

---

5. Even if Georgia Steel had not instituted the declaratory judgment action, the Court could have raised the question of the continuing effect of the Consent Interim Order on its own motion, in accordance with its power of equity. 11 U.S.C.A. § 105 (West 1979); 28 U.S.C.A. § 1481 (West Supp.1982).

practical utility. The Court noted that often in bankruptcy cases, subsequent events presented during the administration of the case demonstrate the necessity of amending or vacating a previous order.

The Second Circuit continued the line of reasoning it took in *Texlon* in deciding *Montco, Inc. v. Barr (In re Emergency Beacon Corp.),* 666 F.2d 754 (2d Cir.1981). In *Emergency Beacon,* the Second Circuit held that a bankruptcy court may revoke or vacate an order subsequently deemed improper at any time so long as there are no vested intervening rights.

■ In light of the Second Circuit's decisions in *Texlon* and *Emergency Beacon* and the reasons discussed therein, this Court concludes that it has the power to vacate or amend the Consent Interim Order of September 25, 1981. Subsection (3) of Rule 60(b) allows a court to vacate or amend a final order for fraud, misrepresentation or other misconduct of an adverse party. The Court is of the opinion that C & S's failure to advise Georgia Steel and the Court as to how many motor vehicle certificates of title were actually at issue constitutes such misrepresentation or misconduct as to justify the Court's vacating the September 25, 1981 Consent Interim Order to the extent that it required Georgia Steel to execute the motor vehicle certificate of title application forms in favor of the three defendant creditors.

In *Emergency Beacon,* the Second Circuit stated that "[o]rdinarily clause (3) [of Rule 60(b)] is invoked where material information has been *withheld* or incorrect or perjured evidence has been intentionally supplied." 666 F.2d 759 (emphasis added). In this case, officers at C & S were aware that there had been no perfection as to at least fifty-two vehicles, but did not give this information to the Court or to Georgia Steel. Instead, C & S allowed the Court and Georgia Steel to labor under the impression that security interests in only "a few" vehicles were unperfected. The fact that C & S was unperfected as to fifty-two vehicles is material, and knowledge of that fact could have caused either Georgia Steel or the Court to withhold consent to the September 25, 1981 Consent Interim Order. C & S's failure to disclose the true status of its perfection constitutes a misrepresentation that calls for the Court's application of Rule 60(b) to partially vacate the order.

Further, there have been no vested intervening rights, and C & S will not be placed in a worse position than when the Consent Interim Order was entered. The Consent Interim Order provided that Georgia Steel would cause the security interests of C & S to be perfected in the vehicles. However, Georgia Steel in fact never executed the motor vehicle certificate of title application forms and thus no legally perfected interest ever vested in C & S as to the sixty motor vehicles. C & S has been adequately protected throughout the pendency of the bankruptcy case by the $25,000 monthly payments of Georgia Steel, and there has been· no evidence presented to the Court that C & S lost anything during the period covered by the Consent Interim Order. C & S insists that because it allowed Georgia Steel to use the cash collateral, it put itself "at risk" and thus is entitled to the security interest in all sixty motor vehicles. The test, however, looks to *actual loss* and C & S has failed to demonstrate any such loss.[6]

In light of the Court's finding of misrepresentation on the part of C & S and in light of the fact that no rights ever vested in C & S as a result of the September 25, 1981 Consent Interim Order, paragraph four of the Consent Interim Order, which in effect required Georgia Steel to execute the motor vehicle certificate of title application forms for the vehicles as to which the three defendant creditors were not properly perfected, is vacated.[7] It is the opinion of the

---

6. The other requirements of Rule 60 are also satisfied in this adversary proceeding. The Consent Interim Order is a final judgment because no appeal was filed with the Court within ten days of the entry of the order. R.Bankr.P. 803. Also, Georgia Steel's request for declaratory judgment was brought within a year of the entry of the Consent Interim Order.

7. 28 U.S.C.A. § 2202 (West 1982) allows a court to grant "[f]urther necessary or proper relief based on a declaratory judgment or de-

Court that Georgia Steel is not required to execute any of the sixty motor vehicle certificate of title application forms in question so as to show the three defendant creditors as lienholders.[8]

---

cree ..., after reasonable notice and a hearing, against any adverse party whose rights have been determined by such judgment." The parties, in the hearings on the declaratory judgment issue, have already litigated the matter of C & S's misrepresentation. Therefore, the Court incorporates into the declaratory judgment the order vacating paragraph four of the Consent Interim Order.

8. Had C & S in actuality desired to perfect only as to the eight vehicles whose certificates of title were held by Georgia Steel during the negotiations over the September 25, 1981 Consent Interim Order, there would have been no misrepresentation and thus no grounds to vacate paragraph four of the September 25 Consent Interim Order. However, the fact remains that C & S was less than candid with the Court as to the presence of the other fifty-two certificates of title. This lack of candor leads to the vacation of paragraph four of the Consent Interim Order *in its entirety*, not just as to the fifty-two vehicles. Because of its misrepresentation, C & S is now unable to perfect its security interest in *any* of the sixty vehicles.